# EXHIBIT 3

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **INTERNATIONAL CONFECTIONS COMPANY, LLC,** | Case No. 2:18-CV-01108-EAS-CMV |
| Plaintiff, | Chief Judge Edmund A. Sargus, Jr. |
| v. | |
| **Z CAPITAL GROUP, LLC, *et al.*,** | |
| Appellees. | |

---

## AFFIDAVIT OF MATTHEW KANE

---

STATE OF    ILLINOIS          )
                             ) SS:
COUNTY OF LAKE               )

I, Matthew Kane, being first duly sworn, depose and say that:

1.      My name is Matthew Kane, and I am over the age of eighteen (18) and of sound mind. I have personal knowledge of the statements made herein.

2.      I serve as General Counsel and Chief Compliance Officer for Z Capital Group, LLC. I am employed by Z Capital Management, LLC, which provides services for Z Capital Group, LLC. I also provide executive leadership for and am a member of the firm's Management Committee. I have been with Z Capital Group, LLC since August 2014.

3.      I have personal knowledge of Z Capital Group, LLC and Z Capital Partners, LLC, which I refer to collectively herein as simply "Z Capital." By virtue of my role with Z Capital, and by virtue of Z Capital's role with its affiliates, I also have personal knowledge of some activities of Z Capital's affiliates, and I provide that personal knowledge in this Affidavit.

1

4.    James J. Zenni, Jr. ("Mr. Zenni") is the sole member of a Delaware limited liability company and the sole trustee of a family trust (which I refer to collectively herein as the "Parent Entities"). Those Parent Entities own Z Capital Group, LLC. Z Capital Group, LLC owns 100% of Z Capital Partners, LLC. In other words, the Parent Entities own and/or control Z Capital.

5.    Z Capital Group, LLC is an alternative asset manager, with two primary investment verticals – private equity investing and credit investing. Z Capital Partners, LLC serves as the private equity arm of Z Capital Group, LLC.

6.    Together, Z Capital invests in companies through Delaware limited partnerships (which I refer to herein as the "Funds") that are formed to hold pooled capital from Z Capital's investors, who are the limited partners in these investment partnerships.

7.    Affiliates of Z Capital, which are all under the common ownership of Z Capital Group, LLC (and similarly, under the common control of the Parent Entities), serve as the General Partner of the Funds and retain sole authority and control over the Funds' ownership of investments. Another affiliate of Z Capital serves as the investment advisor to those Funds.

8.    Z Capital's investments include Mrs. Fields Franchising, LLC (which I refer to herein as "Franchising") and Mrs. Fields Confections, LLC (which I refer to herein as "Confections"). Confections and Franchising (which I refer to in the collective as "Mrs. Fields") are both directly owned by Mrs. Fields Famous Brands, LLC, which through other intermediaries, is eventually owned and controlled by MFOC Holdco, Inc. ("Holdco"). Holdco is where the Board of Directors for the Mrs. Fields entities resides. Holdco's sole shareholder is Famous Brands Holdings, LLC, which is held by one or more of the Funds.

9.    In sum, Z Capital manages and controls the investments made in companies through the Funds. Those Funds own and control Famous Brands Holdings, LLC. Famous Brands

Holdings, LLC controls Holdco, and Holdco serves as the Board of Directors for the Mrs. Fields entities.  Therefore, the Mrs. Fields entities are under the common control of Z Capital (through intermediaries), and the Z Capital entities are under the common control of the Parent Entities.  In other words, Z Capital, Franchising, and Confections are under the common control of the Parent Entities.

10.    Regardless of whether one starts with Z Capital or with one of the Mrs. Fields entities, one can work their way up through the ownership chain and reach the Parent Entities in an unbroken path.

11.    I am aware of a license agreement (the "License Agreement") that was entered into between International Confections Company, LLC (referred to herein as "ICC") and Franchising on or about May 16, 2013.  Under that License Agreement, ICC was granted certain benefits, including the right to use Franchising's trademarks, in exchange for valuable consideration.  For example, ICC was required to remit accrued and unpaid royalties to Franchising on specific timelines, tender interest payments, provide certified statements regarding sales, maintain insurance and specific levels of insurance, and various other obligations.

12.    By letter dated August 26, 2014, Franchising notified ICC through a notice of default (the "Notice of Default") that ICC had defaulted on its obligations under the License Agreement.  Per the terms of that Notice of Default, the license terminated if the multiple defaults noted therein were not cured in 30 days.  Accordingly, on September 26, 2014, after ICC failed to cure, Franchising confirmed that the License Agreement terminated pursuant to its own terms on that date.

13.    ICC refused to recognize the Notice of Default and thereafter refused to acknowledge the termination.  Even after notification of default and the confirmation of

termination, ICC continued advertising Mrs. Fields-branded products for sale. As a result, Franchising sued ICC in federal court.

14.    It was not until that suit was filed that Z Capital learned that ICC had been placed into receivership in a Utah state court.

15.    As I understand it, ICC was placed into receivership in a Utah state court after Transportation Alliance Bank ("TAB") sued ICC and others on a loan and guarantee. As part of that receivership process, I understand that a receiver was appointed to manage and sell ICC's assets.

16.    Confections and the court-appointed receiver negotiated a sale of ICC's assets, later agreeing to a sale for $2.15 million to Confections in exchange for ICC's assets. The sale was memorialized in an asset purchase agreement (the "Purchase Agreement"). That Purchase Agreement contained a broad release (the "Release"), which released any and all claims against Confections or Confections' employees, officers, directors, members, affiliates, and agents. A copy of that Purchase Agreement is attached hereto for reference as Exhibit 1 to my affidavit.

17.    I was one of the individuals involved in the negotiation of the terms and language used in the Purchase Agreement. Because I was involved, I know what Confections intended by the words used in that Purchase Agreement and Release.

18.    I have personal knowledge of the language in the Release, including the meaning and intent behind the word "affiliates."

19.    In addition to having Confections acquire ICC's assets, it was important to Confections and its affiliates to resolve any doubt related to potential or actual litigation, especially considering Confections was about to pay over $2 million to acquire those assets. Confections expressly bargained for the Release to ensure that all litigation would be extinguished and that no

4

entity had a claim against Mrs. Fields, Z Capital, or any of Confections' other employees, officers, members, affiliates, and agents. This broad Release of Confections, Z Capital, and others was a material term to the sale.

20.    The Purchase Agreement does not include a specific definition of "affiliates" because "affiliates" has a well-known meaning. Both Utah law (which applies to the Release) and the common meaning of that word in many states and industries all encompass the same common meaning. That common meaning is universally understood, especially by those actually involved in the transaction that resulted in the Purchase Agreement. That common meaning is understood to include entities that are controlled by or under the common control of another entity.

21.    There is no question in my mind – as a person who was involved in the negotiation of the Purchase Agreement – that both Z Capital entities in this litigation and others are "affiliates" as that word is defined by the State of Utah, by dictionaries, and through the universally understood meaning of that word in the industry.

22.    I also note that Z Capital's private equity business treats Z Capital as an affiliate of its portfolio companies (including Mrs. Fields) for purposes of the U.S. Securities and Exchange Commission, in regulatory filings, and for programs such as the Payroll Protection Programs under the CARES Act.

23.    After the sale of ICC's assets to Confections, ICC sued Franchising in federal court. ICC dismissed that case shortly after it was filed and immediately after Franchising sent a letter to counsel for ICC that contained a copy of the broad Release described above.

24.    As I understand it, ICC sued Z Capital and alleged that Z Capital interfered with the License Agreement (and apparently, a related Consent to Collateral Assignment Agreement, which together with the License Agreement, I refer to herein as the collective "Agreements").

5

25. Z Capital took no action to terminate or direct others to terminate the Agreements.

26. At no time did Z Capital retain outside consultants to work with Mrs. Fields Famous Brands, LLC (or any other entity with the name Famous Brands) or Mrs. Fields. I do believe, however, that Mrs. Fields Famous Brands, LLC – not Z Capital – may have hired an outside consultant to identify potential new licensees in channels where Mrs. Fields did not have a licensing partner.

27. Z Capital had no involvement in the decision to hire a consultant, and Z Capital certainly did not direct anyone to do anything related to the Agreements.

28. To be clear: Z Capital took no action related to the Agreements, and Z Capital certainly took no action related to the Agreements after August 26, 2014. Z Capital did not direct anyone to terminate the Agreements.

This affidavit, to the best of my knowledge, is true and accurate.

_____
Matthew Kane


Before me, a Notary Public in for said county and state, personally appeared Matthew Kane, who executed this document and is known to me personally or otherwise identified himself to my satisfaction on this day, March 5, 2021.


_____
Notary Public


_____July 31, 2023_____
My Commission Expires

OFFICIAL SEAL
ALLISON A FOSS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:07/31/23

6

# EXHIBIT 1

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is entered into and effective as of December 17, 2014, between Mrs. Fields Confections, LLC (the "Buyer") and Kent Goates only in his capacity as court-appointed receiver of the business and assets of International Confections Company, LLC, dba Maxfield Candy ("Maxfield") and NG Acquisition, LLC ("NG") in case no. 140907314 in the Utah Third District Court (the "Seller"). The Buyer and the Seller are referred to collectively herein as the "Parties" and individually as a "Party."

A.    On October 21, 2014, Transportation Alliance Bank Inc. ("TAB"), as a secured creditor, filed a lawsuit against Maxfield and NG (collectively the "Companies") and their principal Michael Ryan in the case captioned *Transportation Alliance Bank Inc. v. International Confections Company, LLC*, in the Utah Third District Court (the "Court"), Civil No. 140907314 (the "Lawsuit"). In the Lawsuit, TAB requested the appointment of a receiver under Utah Rule of Civil Procedure 66.

B.    After the filing of the Verified Complaint and TAB's motion seeking appointment of the receiver, the following creditors intervened in the Lawsuit to protect their respective interests: Wasatch Peak Holdings, LLC, Dynamic Confections, Inc., Back Bay Investments, LC, Arcadia Holdings, LLC, and Bank of American Fork (collectively the "Intervening Creditors").

C.    On November 13, 2014, the Court issued an order appointing the Seller as receiver (the "Receivership Order") in the Lawsuit, stating, among other things, as follows:

Receiver, as an officer of this Court, shall immediately have and take possession, custody, and control of the business and all of the assets of both Maxfield and NG (together, the "Companies") including, without limitation, the Collateral (as defined in the *Verified Complaint*), all real property, improvements, leases, equipment, fixtures, rents, accounts, inventory, and other personal property (the "Assets").

D.    On December 3, 2014, with the stipulation of all the parties in the lawsuit, the Receivership Order was amended to provide, among other things, as follows:

Receiver is hereby granted authority from the Court to market and sell the Assets, as defined in the Receivership Order, or any portion thereof, and, in his business judgment, to hire the appropriate professionals to assist with the same, but subject to (a) prior notice to all parties to this action, through their counsel of record, who may object to any such proposed sale, and (b) as to any proposed disposition as to which an objection is filed with the Court, further order from the Court approving Receiver's decision to sell the Assets or any part thereof.

E.    The Companies are or were in the business of manufacturing, processing, selling, and distributing confections, including chocolates, nuts, candied nuts, and other confections (the "Business");

F.    The Seller wishes to sell to the Buyer, and the Buyer wishes to purchase from the

SLC_2016054

Seller, substantially all of the Assets, as defined in Paragraph B of the Receivership Order and further defined below, free and clear of liens, claims, encumbrances and interests, pursuant to the Seller's authority under the Receivership Order; and

G.      Following the Seller's solicitation of offers for the purchase of the Assets, Buyer has provided the highest and best offer for the purchase of the Assets to date.

Now, therefore, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties hereby agree as follows.

<u>DEFINITIONS</u>

The following terms shall have the meanings set forth below as used in this Agreement:

"Accounts Receivable" means any and all accounts receivable, trade receivables, notes receivable and other receivables of the Companies arising out of the Business.

"Agreement" means this Asset Purchase Agreement, including all Exhibits hereto, as it may be amended from time to time in accordance with its terms.

"Assets" shall have the meaning assigned to it in the Receivership Order, which includes among other things, the Seller's interest in the following assets:

        (a)      all Inventories;

        (b)      all Accounts Receivable;

        (c)      all Intangible Property;

        (d)      all Intellectual Property;

        (e)      all Equipment;

        (f)      all goodwill and going concern value in or arising from the Assets and the Business;

provided, however, that, notwithstanding the foregoing, the term "Assets" shall not include the Excluded Assets under this Agreement, as defined below.

"Bill of Sale" means the Bill of Sale, substantially in the form attached hereto as <u>Exhibit A</u>.

2

"Business" shall have the meaning assigned to it in the Recitals.

"Claims" means all claims, encumbrances, liabilities, options, charges, obligations, Taxes, Employee Claims, Environmental Liabilities, rights of third parties (express or implied), restrictions, licenses, and interests of any kind or nature whatsoever, that may exist in or against the Companies or the Seller.

"Closing" means the consummation of the transactions contemplated herein in accordance with Article V hereof.

"Closing Date" means the date on which the Closing occurs or is to occur.

"Closing Payment" shall have the meaning assigned to it in Section 1.02.

"Court" shall have the meaning assigned to it in the Recitals.

"Employee Claims" means (i) any claims for severance pay, termination pay, redundancy pay, pay in lieu of notice or any other claim for similar compensation or damages relating to the termination of any employee or independent contractor of the Seller prior to the Closing Date, or (ii) any claims for compensation by any employee or independent contractor of the Seller for services rendered prior to the Closing Date.

"Encumbrance" means any and all Liens and Claims.

"Environmental Law(s)" means any federal, state or local law (including any statute, rule, regulation, ordinance, code or rule of common law), and any judicial or administrative interpretation thereof, and any decree, judgment, policy, written guidance or judicial or administrative order relating to the environment, health, safety, or Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9901 et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq., the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq., the Toxic Substance Control Act, 15 U.S.C. § 2601 et seq., the Safe Drinking Water Act, U.S.C. § 300f et seq., the Occupational Safety and Health Act, 42 U.S.C. § 1801 et seq., the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq., and their state counterparts or equivalents, all as amended, and any regulations or rules adopted or publications promulgated pursuant thereto.

"Environmental Liabilities" means Claims under any Environmental Law relating to the operation of the Business that existed on or prior to the Closing Date.

3

SLC_2016054

"Equipment" means any and all of the machinery, equipment, installations, furniture, tools, molds, spare parts, supplies, maintenance equipment and supplies, materials, automobiles, trucks and other vehicles and other items of personal property of every kind and description, of the Seller used in connection with the Business but excludes the items shown on Exhibit B which are subject to leases or contracts in favor of the parties shown on Exhibit B.

"Excluded Assets" means the following tangible and intangible assets of the Seller: (i) all of the Seller's cash and cash equivalents, interests in deposit or checking accounts, certificates of deposit and other marketable securities; (ii) any lease or contract (that is not a Receivable) and that is not specifically assigned to and assumed by Buyer (any specifically assigned and assumed leases or contracts are listed in Exhibit B); and (iii) any other tangible or intangible property listed on Exhibit B.

"Final Order" means an order of the Court approving the sale of the Assets to the Buyer and finding that the Seller and the Buyer have complied in all respects with the Receivership Order, and that is not subject to any pending motion for reconsideration, rehearing or reargument, and not subject to any stay.

"Governmental Authority" means the government of the United States or any state or political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Hazardous Materials" means any materials which are crude or refined oil or fractions thereof, petroleum, PCBs, friable asbestos, urea formaldehyde, flammable explosives, radioactive materials, hazardous wastes, toxic, mutagenic or pathogenic substances, paint containing lead or mercury; including, without limitation, any substances which are substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," or "toxic substances" under any applicable federal or state laws or regulations.

"Intangible Property" means all intangible assets, patents, customer lists, formulas, recipes, licenses, designs, trademarks and trade names whether or not formally registered, employee contract rights, and non-compete agreements.

"Intellectual Property" means all United States and foreign patents, patent registrations and patent applications, patent licenses, trade names, brand names, logos, trademarks, trademark licenses, service marks and trademark registrations (and applications therefor, including intent-to-use applications, and all issuances, extensions and renewals of such registrations and applications), copyrights, copyright registrations, copyright licenses (and applications therefor, and all issuances, extensions and renewals of such registrations and applications), confidential

4

information, trade secrets, inventions, processes, designs, devices, know-how, show-how, recipes, formulae, methods, compositions, operating manuals, computer software, technology or the like, and all applications for any of the foregoing, in each case, held by the Seller and as used in the conduct of the Business, together with the goodwill associated therewith and including all rights to sue for past infringement in connection therewith. Without limiting the generality of the foregoing, "Intellectual Property" shall specifically include the "Nutty Guys", Maxfield's Candy", and "Maxfield Candy" trademarks and all related brands, copyrights, and service marks owned by the Companies.

"Inventories" means all of the Seller's inventories, including all packaging, supplies, parts, raw materials, work in process, returned merchandise, and finished goods inventories, in each case, wherever located.

"Lawsuit" shall have the meaning assigned to it in the Recitals.

"Lien" means any interest in property securing an obligation, whether such interest is based on common law, statute, or contract (and including, but not limited to, any security interest or lien arising from a mortgage, pledge, charge, easement, servitude, security agreement, conditional sales or trust receipt, or a lease, consignment or bailment for security purposes), reservations, exceptions covenants, conditions, restrictions, leases, subleases, licenses, occupancy agreements, pledges, equities, charges, assessments, covenants, reservations, mechanics' liens, Taxes, defects in title, encroachments and other burdens, and other title exceptions and encumbrances affecting property of any nature, whether accrued or unaccrued, tangible or intangible, or absolute or contingent.

"Purchase Price" shall have the meaning set forth in Section 1.02.

"Receivership Order" shall have the meaning assigned to it in the Recitals.

"Secured Creditors" shall mean the Intervening Creditors identified in the Recitals and also Wells Fargo Equipment Finance, Inc. by virtue of its security interest in the Cookie Dough Automation System, as described in the UCC-1 filing, attached hereto as Exhibit C.

"Tax" or "Taxes" means all taxes, charges, fees, duties, levies or other assessments, including (without limitation) income, gross receipts, net proceeds, ad valorem, turnover, real and personal property (tangible and intangible), sales, use, franchise, excise, value added, stamp, leasing, lease, user, transfer, fuel, excess profits, occupational, interest equalization, windfall profits, severance and employees, income withholding, unemployment and Social Security taxes, which are imposed by the United States, or any state, local or foreign government or subdivision or agency thereof, and such term shall include any interest, penalties or additions to tax attributable to such Taxes.

5

SLC_2016054

## ARTICLE I
### PURCHASE AND SALE

Section 1.01. <u>Sale and Purchase</u>. Subject to the terms and conditions set forth in this Agreement, on the Closing Date, the Seller shall sell, assign, transfer, convey and deliver to the Buyer, and the Buyer shall accept, acquire and take assignment and delivery of the Assets, including all the Seller's right, title and interest in, to and under all of the Assets. The Seller shall transfer the Assets to the Buyer pursuant to a Bill of Sale substantially in the form of <u>Exhibit A</u>. The Buyer shall purchase the Assets pursuant to a Final Order of the Court, free and clear of all Encumbrances as specifically set forth in this Agreement. The Buyer acknowledges that it is not purchasing, and the Seller is not selling, any of the Excluded Assets under this Agreement. For purposes of this Agreement, purchase or sale "free and clear of all Encumbrances" shall be accomplished by the Seller, before or at Closing, making payment of a negotiated amount to each of the Secured Creditors sufficient to cause each of them to release, before or at Closing, any Encumbrance each may have against any of the Assets to be sold.

Section 1.02. <u>Payment of Purchase Price</u>. Subject to the terms and conditions hereof, the Buyer shall provide consideration for the transfer of the Assets described in Section 1.01 in the amount of $2,150,000 (the "Purchase Price"), payable as $2,150,000 through wire transfer to or directed by Seller on or before the Closing Date.

Section 1.03 <u>"As Is" Sale</u>. Notwithstanding anything in this Agreement to the contrary except for the representations made in Article II below, the Assets are being sold "as is" and "where is" in all respects; neither the Seller nor any of its agents, attorneys, or representatives has made or makes any warranty or representation whatsoever regarding the Assets, or any other matter in any way related to the Assets, including, but not limited to, the use, value, or any other condition of the Assets. Buyer agrees that it is not relying on and specifically waives any claim of liability based on any statement, representation, warranty, promise, covenant, or undertaking by the Seller or any other person representing or purporting to represent the Seller in connection with the sale of the Assets. To the extent the Buyer wishes to move or transport any of the Assets from their present location, it shall be the Buyer's responsibility at the Buyer's expense to move or transport the Assets. BY SIGNING BELOW THE SELLER EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, IN CONNECTION WITH THE SALE OF THE ASSETS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

Section 1.04. <u>No Liabilities Assumed</u>. For the avoidance of doubt, and notwithstanding anything in this Agreement to the contrary, the Parties acknowledge and agree that the Buyer is only purchasing Assets and is not assuming, and does not assume, any liabilities whatsoever of

6

SLC_2016054

the Companies, of the Business, or of the Seller, unless otherwise provided in Exhibit B.

## ARTICLE II
### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller hereby represents and warrants to the Buyer as follows:

Section 2.01   Seller as Receiver; Authority.  The Seller is the Court-appointed receiver of the Business and all the Assets, and, as described in the Recitals and in the Receivership Order, is authorized to sell the Assets.  Subject to Court approval, this Agreement has been duly and validly executed and delivered by the Seller and constitutes a legal and binding obligation of the Seller, enforceable against the Seller and Companies in accordance with its terms.  Subject to Court approval, the Seller has the requisite power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby.

Section 2.02   Legal Proceedings.   There are no actions pending or, to the Seller's knowledge, threatened against or by the Companies or the Seller and not known to the Buyer (a) that seek to encumber the Assets; or (b) that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.  No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such action.

Section 2.03   No Other Agreement.  Seller has not entered into any contract, agreement, arrangement or understanding with respect to the sale or other disposition of the Assets except as set forth in this Agreement.

Section 2.04   Brokers.  Seller has not agreed to pay any party a commission, finder's fee or similar payment in regard to the transaction contemplated by this Agreement and has not taken any action on which a claim for any such payment could be based.

Section 2.05   Inventories.   Seller has provided to Buyer all the information Seller has regarding inventories, including an inventory list of certain ingredients, components, finished goods, and packing materials dated November 13, 2014 (the "Inventory List").

Section 2.06   Release of Claims.   Effective upon the Closing of the sale that is the subject of this Agreement, Seller on his own behalf and on behalf of the Companies waives and releases any and all claims he or the Companies may have against the Buyer and its employees, officers, directors, members, affiliates, and agents except for claims arising under this Agreement.

7

SLC_2016054

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller as follows:

Section 3.01  Authority.  This Agreement has been duly and validly executed and delivered by the Buyer and constitutes a legal and binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms.  The Buyer has the requisite corporate and legal power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby.  The execution, delivery and performance by the Buyer of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite limited liability company action on the part of the Buyer.

Section 3.02  No Representations.  No oral or written representations have been made other than as stated in this Agreement, and no oral or written information furnished to the Buyer or the Buyer's advisor(s) in connection with the purchase and sale of the Assets was in any way inconsistent with the information stated in this Agreement.  The Buyer acknowledges that it has been advised that no person or entity is authorized to give any information, or to make any statement regarding the Companies, the Business, or the Assets, and that any such information or statement must not be relied upon as having been authorized by the Seller or its professional advisors.

Section 3.03  No Reliance.  The Buyer is not relying on the Seller with respect to the Tax and other economic considerations of its acquisition.  Where it has deemed it appropriate, the Buyer has consulted its own financial, legal and Tax advisors with respect to the economic, legal and Tax consequences of its proposed purchase of the Assets and has not relied on the Seller or its agents or representatives for advice as to such consequences.

Section 3.04  Brokers.  The Buyer has not agreed to pay any party a commission, finder's fee or similar payment in regard to the transaction contemplated by this Agreement and has not taken any action on which a claim for any such payment could be based.

Section 3.05  No Liability for Receiver.  The Buyer understands and warrants that the Receiver has no personal liability under this Agreement and that his participation in this Agreement is solely as the representative of the receivership estate of the Companies created by Utah law.

Section 3.06  Release of Claims.  Effective upon the Closing of the sale that is the subject of this Agreement, Buyer waives and releases any and all claims against the Receiver, his agents and representatives, and the receivership estate or any entity whose assets are included in the receivership estate except for claims arising under this Agreement.

8

SLC_2016054

ARTICLE IV
PRE-CLOSING COVENANTS

The Parties agree that from the date hereof to the Closing Date:

Section 4.01    Implementing Agreement.  The Parties will use their best efforts in good faith to perform and fulfill all conditions and obligations to be fulfilled or performed by them hereunder, to the end that the transactions contemplated hereby will be fully and timely consummated.  The Seller covenants and agrees that it shall as soon as practicable after execution of this Agreement (i) take all steps necessary to obtain a Final Order of the Court and to complete the transactions contemplated hereby (including, without limitation the sale of the Assets, in each case free and clear of all Encumbrances to the fullest extent possible under Utah law) and (ii) provide expedited written notice to each of the Secured Creditors of this Agreement and of the intent to obtain a Final Order approving the Agreement and the transactions contemplated thereunder.

Section 4.02    Consents and Approvals.  The Parties will use their reasonable best efforts to obtain all necessary consents and approvals to the performance of their respective obligations under this Agreement and the transactions contemplated hereby.  The Parties will make all filings, applications, statements and reports to all Governmental Authorities which are required to be made prior to the Closing Date pursuant to any applicable statute, rule or regulation in connection with this Agreement and the transactions contemplated hereby.

Section 4.03    Access to Information.  The Seller shall give the Buyer and the Buyer's representatives full access during normal business hours, to all of the facilities, properties, books, contracts, commitments and records relating to the Business.  In order that the Buyer may have full opportunity to make such examination and investigation as it may desire of the Business, the Seller will furnish the Buyer and its representatives during such period with all such information held by or reasonably available to the Seller as such representatives may reasonably request.

Section 4.04    Subject to Higher and Better Offers.  This sale and the transactions contemplated by this Agreement are subject to a bona fide higher and better offer received in writing by the Seller prior to the commencement of the Sale Hearing (defined below).  That means that if another buyer is able and willing to purchase the Assets, or a portion of the Assets, for consideration which the Seller believes in good faith represents a higher and better offer for some or all of the Assets and that exceeds the Purchase Price stated in this Agreement by at least $200,000, then the Seller may accept that higher and better offer prior to commencement of the Sale Hearing.  However, if the Seller receives such a higher and better offer, the Seller will provide the Buyer with an opportunity to submit an even higher offer. The Seller will request the Court to approve sale of the Assets under this Agreement at a hearing before the Court on

9

SLC_2016054

December 23, 2014 or the soonest available date thereafter that the Court can hold such hearing (the "Hearing Date"). If the Seller obtains a higher and better offer and closes on a sale of all or a substantial portion of the Assets to any person or entity other than the Buyer or an affiliate of the Buyer, Seller will, at the closing of such alternative transaction, reimburse the Buyer for its reasonable out-of-pocket expenses (including, but not limited to, reasonable fees of its professionals) actually incurred in connection with this Agreement, but in any event not to exceed $100,000.

## ARTICLE V
## CLOSING

Section 5.01    Closing.  Subject to the satisfaction or waiver of each of the conditions set forth in Article VI hereof, the Closing shall take place at the offices of Durham Jones & Pinegar on the first date after all the conditions of closing have been met, unless another date is agreed to in writing by the Parties.  In no event shall closing occur later than December 31, 2014 unless otherwise agreed in writing by the Parties.

Section 5.02    Deliveries by the Seller.  At the Closing, the Seller will deliver to the Buyer the following:

(a)    The Bill of Sale, executed by the Seller, substantially in the form attached hereto as Exhibit A.

Section 5.03    Deliveries by the Buyer.  At the Closing, the Buyer will deliver to the Seller the following:

(a)    the Closing Payment.

## ARTICLE VI
## CONDITIONS TO CLOSING

Section 6.01    Conditions to Obligations of Both Parties.  The obligations of each Party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)    Neither the Court nor any other Governmental Authority shall have enacted, issued, promulgated, enforced or entered any order, decree or ruling or taken any other action which is in effect and has the effect of making the transactions contemplated by this

10

SLC_2016054

Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b)   The Parties shall have received all consents, authorizations, orders and approvals from Governmental Authorities that are required in connection with the consummation of the transactions contemplated by this Agreement, including the Final Order, in each case, in form and substance reasonably satisfactory to the Buyer and the Seller, and no such consent, authorization, order and approval shall have been revoked.

Section 6.02   Conditions to Obligations of the Buyer.  The obligations of the Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or the Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)   the Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement to be performed or complied with by it prior to or on the Closing Date, including but not limited to reaching agreement with each of the Secured Creditors and obtaining a release of their Encumbrances on the Assets as required by Section 1.01;

(b)   no action shall have been commenced against the Buyer or the Seller, which would prevent the Closing;

(c)   no injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits the transactions contemplated hereby;

(d)   the Final Order shall have been entered by the Court in form and substance reasonably satisfactory to the Buyer, including that such order shall provide for the Buyer's purchase of the Assets free and clear of all Encumbrances, as defined in this Agreement;

(e)   the Buyer shall have negotiated a reasonably satisfactory agreement with the landlord of the Seller's primary manufacturing facility where the Assets are located;

(f)   there shall have been no material adverse change in the Business between December 11, 2014 and the Closing Date; and

(g)   there shall have no material reduction in the inventory levels since Buyer conducted its inspection of the existing inventory.

Section 6.03   Conditions to Obligations of the Seller.  The obligations of the Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or the Seller's waiver, at or prior to the Closing, of each of the following conditions:

11

SLC_2016054

(a)    the Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement by or on the Closing Date;

(b)    no injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits the transactions contemplated hereby;

(c)    the Seller shall have negotiated a payment amount to each of the Secured Creditors sufficient to cause each of them to release any lien or encumbrance each may have against any of the Assets to be sold;

(d)    the Seller shall have determined in his sole discretion that there is sufficient cash in the estate from the proceeds of the sale contemplated by this Agreement or otherwise to pay all costs of the receivership including professional fees in full, as allowed by the Receivership Order; and

(e)    the Seller shall have obtained entry by the Court of the Final Order.

## ARTICLE VII
## POST-CLOSING COVENANTS

The Parties agree to perform and/or observe, as may be the case, the provisions of this Article VII with respect to the period following the Closing Date.

Section 7.01    Further Assurances.  In case at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action, including the execution and delivery of additional instruments and documents, as the other Party reasonably may request, all at the sole cost and expense of the requesting Party.

Section 7.02    Litigation Support.  In the event and for so long as any Party actively is contesting or defending against any action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand regarding a third party(ies) in connection with (i) any transaction contemplated under this Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction occurring on or prior to the Closing Date involving the Business, the other Party will cooperate with the contesting or defending Party and its counsel in the contest or defense, reasonably make available its personnel, and provide such testimony and access to its books and records as shall be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party.

12

SLC_2016054

## ARTICLE VIII
## TERMINATION

Section 8.01    Termination.  This Agreement may be terminated at any time on or prior to the Closing Date:

(a)    with the written mutual consent of the Seller and the Buyer;

(b)    by the Buyer or the Seller, if any court, including the Court, or any Governmental Authority has issued an order, decree or ruling or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement, and such order, decree, ruling or other action has become final and non-appealable; provided that this Agreement shall not be terminated unless the Party terminating this Agreement has utilized its reasonable best efforts to oppose the issuance of such order, decree or ruling or the taking of such action;

(c)    by either the Buyer or the Seller, if the other Party is in material breach of any representation, warranty, covenant or agreement contained in this Agreement and fails to cure such breach within five (5) days of notice of such breach by the non-breaching Party (provided, that no Party may terminate the Agreement under this clause if such Party is in material breach of its obligations under this Agreement);

(d)    by the Buyer, if the Court has not issued on or before December 31, 2014, or on a date as may be otherwise agreed by the Parties, a Final Order; and

(e)    by either the Buyer or the Seller, if the Closing has not occurred on or prior to December 31, 2014, for any reason other than the breach of any provision of this Agreement by the Party seeking to terminate this Agreement.

In the event of any termination pursuant to this Section 8.01, written notice setting forth the reasons thereof shall forthwith be given by the Buyer, if the Buyer is the terminating party, to the Seller, or by the Seller, if the Seller is the terminating party, to the Buyer.

Section 8.02    Effect of Termination; Remedies.

(a)    In the event of termination pursuant to Section 8.01, this Agreement shall become null and void and have no effect (other than this Article VIII, which shall survive termination), with no liability on the part of the Seller or the Buyer, or their respective directors, officers, employees, or agents, with respect to this Agreement.

(b)    This Article VIII shall terminate upon the Closing.

SLC_2016054

## ARTICLE IX
## MISCELLANEOUS

Section 9.01    Expenses.  Subject to the terms of this Agreement, each Party shall bear its own expenses with respect to the transactions contemplated by this Agreement.

Section 9.02    Survival.  All covenants and agreements made herein or in any document delivered pursuant to this Agreement shall survive the Closing Date and remain in full force and effect in accordance with their respective terms and until the applicable statute of limitations has expired.

Section 9.03    Amendment.    This  Agreement  may  be  amended,  modified  or supplemented only in a writing signed by each of the Parties.

Section 9.04    Notices.  Any notice, request, instruction or other document to be given hereunder by a Party shall be in writing and shall be deemed to have been given, (i) when received if given in person, (ii) on the date of acknowledgment of receipt if sent by telex, facsimile or other wire transmission or (iii) three days after being deposited in the U.S. mail, certified or registered mail, postage prepaid:

If to Buyer, addressed to Buyer as follows:

Mrs. Fields Confections, LLC
c/o Brian Johnson
Interim Chief Financial Officer
Famous Brands International
8001 Arista Place, 6th Floor
Broomfield, CO  80021
Phone: 720-599-3365
email:  bjohnson@famousbrandsintl.com

with a copy to:

Steven C. Strong
Parsons Kinghorn Harris
111 E. Broadway, Suite 1100
Salt Lake City, Utah  94111
Phone:  801-363-4300
Fax:    801-363-4378

14

Case 1:25-cv-00973-JLH    Document 22-3    Filed 11/03/25    Page 24 of 31 PageID #:
215
Case: 2:18-cv-01108-EAS-CMV Doc #: 35-2 Filed: 03/05/21 Page: 23 of 30  PAGEID #: 309

If to Seller, addressed to Seller as follows:

    Kent Goates, Court-Appointed Receiver
    c/o Peter H. Donaldson
      Penrod Keith
    Durham Jones & Pinegar, PC
    111 East Broadway, 9th Floor
    Salt Lake City, Utah 84111
    Phone: 801-415-3000
    Fax:   801-415-3500

or to such other individual or address as a Party may designate for itself by notice given as herein provided.

Section 9.06  Waivers.  The failure of a Party at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same.  No waiver by a Party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

Section 9.07  Counterparts; Facsimile Signatures.  This Agreement (and any agreement, certificate or other document delivered hereunder) may be executed simultaneously in counterparts and with facsimile signatures, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 9.08  Headings.  The headings preceding the text of Articles and Sections of this Agreement are for convenience only and shall not be deemed part of this Agreement.

Section 9.09  Applicable Law.  This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of Utah.

Section 9.10  Consent to Jurisdiction.  Any legal action or other proceeding arising under this Agreement shall be brought in the Lawsuit, as defined herein, or, if the Lawsuit is not an active case, in the Utah Third District Court.  The Parties hereby submit to the exclusive jurisdiction of the Utah Third District Court and waive any objection to the propriety or convenience of venue in the Utah Third District Court.

Section 9.11  Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, personal representatives, successors and assigns.

SLC_2016054

Section 9.12   Entire Understanding.   This Agreement (including the Exhibits attached hereto and the agreements and other ancillary documents referenced or contemplated herein) set forth the entire agreement and understanding of the Parties in respect to the transactions contemplated hereby and supersede all prior agreements, arrangements and understandings relating to the subject matter hereof and are not intended to confer upon any other person any rights or remedies hereunder.  There have been no representations or statements, oral or written, that have been relied on by either Party, except those expressly set forth in this Agreement.

Section 9.13   Parties in Interest.  This Agreement shall be binding upon and inure solely to the benefit of each Party and its permitted assigns, and nothing in this Agreement, express or implied, is intended to confer any rights or remedies of any nature whatsoever under or by reason of this Agreement upon any other person.  Nothing in this Agreement shall be construed to create any rights or obligations except among the Parties, and no person or entity shall be regarded as a third-party beneficiary of this Agreement.

Section 9.14   Interpretation.   The Parties hereby acknowledge and agree that: (i) each Party and its counsel reviewed and negotiated the terms and provisions of this Agreement and have contributed to their revision; (ii) the rule of construction to the effect that any ambiguities are resolved against the drafting Party shall not be employed in the interpretation of this Agreement; and (iii) the terms and provisions of this Agreement shall be construed fairly as to both Parties hereto and not in favor of or against either Party, regardless of which Party was generally responsible for the preparation of this Agreement.

Section 9.15   Severability.  In the event that any court of competent jurisdiction shall finally determine that any provision, or any portion thereof, contained in this Agreement shall be void or unenforceable in any respect, then such provision shall be deemed limited to the extent that such court determines it enforceable, and as so limited shall remain in full force and effect. In the event that such court shall determine any such provision, or portion thereof, wholly unenforceable, the remaining provisions of this Agreement shall nevertheless remain in full force and effect.

Section 9.16   Attorneys' Fees and Costs.  The Parties agree that in the event of any litigation relating to this Agreement, the prevailing party shall be entitled to recover its reasonable attorney fees, costs, and all other litigation expenses.

16

SLC_2016054

**IN WITNESS WHEREOF**, the Parties have caused this Asset Purchase Agreement to be executed and delivered on the date first above written.

KENT GOATES, COURT-APPOINTED
RECEIVER OF THE ASSETS OF
INTERNATIONAL CONFECTIONS COMPANY,
LLC AND NG ACQUISITION, LLC

MRS. FIELDS CONFECTIONS, LLC

By:_____
    Name:
    Title:

17

IN WITNESS WHEREOF, the Parties have caused this Asset Purchase Agreement to be executed and delivered on the date first above written.

KENT GOATES, COURT-APPOINTED
RECEIVER OF THE ASSETS OF
INTERNATIONAL CONFECTIONS COMPANY,
LLC AND NG ACQUISITION, LLC

_____

MRS. FIELDS CONFECTIONS, LLC

By: _____
Name: Joyce Hrinya
Title: Interim CEO

17

SLC_2016054

Exhibit A

Bill of Sale

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Kent Goates in his capacity as court-appointed receiver of the business and assets of International Confections Company, LLC, dba Maxfield Candy ("Maxfield") and NG Acquisition, LLC ("NG") in case no. 140907314 in the Utah Third District Court ("Seller"), does hereby grant, bargain, transfer, sell, assign, convey and deliver to Mrs. Fields Confections, LLC (the "Buyer"), all right, title and interest in and to the Assets free and clear of any Encumbrances, as such terms are defined in the Asset Purchase Agreement, dated as of December 17, 2014 (the "Asset Purchase Agreement"), by and between Seller and Buyer, to have and to hold the same unto Buyer, its successors and assigns, forever. This Bill of Sale is in all respects subject to the Asset Purchase Agreement, which shall govern the respective rights of Seller, on the one hand, and Buyer, on the other hand, with respect to the Assets, and nothing contained in this Bill of Sale shall in any way supersede, modify, replace, amend, change, rescind, waive, defeat, limit, impair, expand, exceed, enlarge or affect the provisions set forth in, or any person's rights, remedies or obligations under, the Asset Purchase Agreement, this Bill of Sale being intended solely to effect the transfer of the purchased Assets pursuant to the Purchase Agreement. To the extent that any provision of this Bill of Sale is inconsistent or conflicts with the Asset Purchase Agreement, the Asset Purchase Agreement shall control.

Buyer acknowledges: (a) that Seller makes no representation or warranty with respect to the assets being conveyed hereby; (b) that the Assets are being sold "as is" "where is" and "if is" in all respects; and (c) that neither the Seller nor any of its agents, attorneys, or representatives has made or makes any warranty or representation whatsoever regarding the Assets, or any other matter in any way related to the Assets, including, but not limited to, title to the Assets, use, value, or any other condition of the Assets. The Buyer agrees that it is not relying on and specifically waives any claim of liability based on any statement, representation, warranty, promise, covenant, or undertaking by the Seller or any other person representing or purporting to represent the Seller in connection with the sale of the Assets.

Seller for itself, its successors and assigns, hereby covenants and agrees that, at any time and from time to time upon the written request of Buyer, Seller will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and

18

SLC_2016054

assurances as may be reasonably required by Buyer in order to assign, transfer, set over, convey, assure and confirm unto and vest in Buyer, its successors and assigns, the Assets.

IN WITNESS WHEREOF, Seller has duly executed this Bill of Sale as of December __, 2014.

KENT GOATES, COURT-APPOINTED
RECEIVER OF THE ASSETS OF
INTERNATIONAL CONFECTIONS COMPANY,
LLC AND NG ACQUISITION, LLC

_____

19

SLC_2016054

Exhibit B
Excluded Assets; Assumed Contracts or Leases

Excluded Equipment:

| Equipment Description | Creditor (if known) |
|---|---|
| The Nutty Guys Bagging Machine;<br>The Promoweigher Combination Scale 2.5L 10-Head with 360 Operating System and Markem Image 220 Blow System 2430 #A41162 | Balboa Capital Ascentium, |
| Equipment subject to that Equipment Lease between Hake Head, LLC, d.b.a. Maramor Chocolates and CCV Realty, LLC dated July 17, 2012 which was shipped by Mike Ryan to ICC in the spring of 2014.  Such equipment including, but not limited to:<br><br>Molding Machinery Line<br>Roof Compressor (2)<br>Tempering Unit (2)<br>Small Kettles (2)<br>Small Chiller<br>Cooling tunnels (2)<br>Flow Wrapper<br>Date Coder (2)<br>Tempering Tunnel<br>Double Enrober<br>Extruder/Depositor with heads<br>Blue Metal racking | CCV Realty, LLC |

Other Excluded Assets:

[none]

Assumed and Assigned Contracts or Leases:

[none]

20

SLC_2016054

Exhibit C

*[Wells Fargo Equipment, Inc. UCC Filing]*

21

SLC_2016054