## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

REAGAN COX, et al.

       Plaintiffs,

   v.

ZENNI HOLDINGS, LLC et al.

       Defendants

C.A. No. 25-973-JLH

## PLAINTIFFS' BRIEF IN OPPOSITION TO MOTION TO DISMISS

Dated: December 3, 2025

By: /s/ James E. Huggett
**MARGOLIS EDELSTEIN**
James E. Huggett (#3956)
300 Delaware Avenue
Suite 800
Wilmington, DE 19801
Phone 302-888-1112
Fax 302-888-1119

**LANKENAU & MILLER, LLP**
Stuart J. Miller (SJM 4276)
100 Church Street, 8th FL
New York, NY 10007
P: (212) 581-5005
F: (212) 581-2122

**THE GARDNER FIRM, P.C.**
Mary E. Olsen (OLSEM4818)
M. Vance McCrary (MCCRM4402)
182 St. Francis Street
Suite 103
Mobile, Alabama 36602
P: (251) 433-8100
F: (251) 433-8181

*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

I.    CASE STATEMENT AND NATURE OF PROCEEDING . . . . . . . . . . . . . 1

    A.    The Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-4

    B.    The Standard For A Motion To Dismiss . . . . . . . . . . . . . . . . . . . . . 4-6

    C.    Plaintiffs have sufficiently and plausibly alleged that all the
        Defendant "Z" entities were part of a "single employer," making
        them jointly and severally liable should Plaintiffs prevail on the
        merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-9

    D.    Plaintiffs have sufficiently and plausibly alleged that Z Capital
        group, and the Z-branded single employer was also a single
        employer with Maple Mountain, responsible for the WARN Act
        violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-15

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

*Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 955
(8th Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

*APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 244 (3d Cir. 2008) . . . . . .    3, 10

*Chaney v. Vt. Bread Co*., No. 2:21-cv-120, 2023 U.S. Dist. LEXIS 148066,
*21-26 (D. Vt. Aug. 23, 2023) . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . 4, 9

*Childress v. Darby Lumber*, 357 F.3d 1000 (9th Cir. 2004) . . . . . . . . . . . . . .   2

*DSM IP Assets, B.V. v. Honeywell Int'l, Inc.*, 700 F. Supp. 3d 189, 195
(D. Del. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-6

*Erickson v. Pardus*, 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081
(2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

*Garner v. Behrman Bros. IV, LLC*, 260 F. Supp. 3d 369, 381
(S.D.N.Y. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

*Gibbs v. City of Pittsburgh*, 989 F.3d 226, 230 (3rd Cir. 2021) . . . . . . . . . . .  5

*Guippone v. BH S&B Holdings*, 737 F.3d 221 (2nd Cir. 2013) . . . . . . . . . .  2-3

*Inova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of
Ga., Inc.*, 892 F.3d 719, 730 (5th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . .  5

*Iqbal*, 556 U.S. at 679 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) . . . . . . . . . .  6

*Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 107 n.31
(3d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

*Martinez v. UPMC Susquehanna*, 986 F.3d 261, 265 (3rd Cir. 2021) . . . . . . .  4

*McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 267-68
(3d Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

*Pearson v. Component Technology*, 247 F.3d 471 (3rd Cir. 2001) . . . . . . . . . . 2-4, 7-11, 15

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
631 F.3d 436, 442-43 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Shane v. Fauver*, 213 F.3d 113, 115-17 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . 1

## I.     CASE STATEMENT AND NATURE OF PROCEEDING

Plaintiffs Reagan Cox and Mariah Sperry, on behalf of themselves and the class they seek to represent, respectfully submit this brief in opposition to defendants' Motion to Dismiss.[1]

This is a case under the Worker Adjustment and Retraining Notification Act, or "WARN Act," 29 U.S.C. § 2101 *et seq.* The WARN Act generally requires that an employer give 60 days' advance notice before ordering a "plant closing" or "mass layoff." Plaintiffs, and the class they seek to represent, were employed by Maple Mountain[2] until it shut down without any advance WARN Act-compliant notice whatsoever. (Complaint, ¶¶ 1, 15).

Defendants in this case – various entities in the "Z Capital" group, a private equity outfit[3] – are sued under the WARN Act's "single employer" doctrine. The allegations of the Complaint offer a paradigm case for "single employer" liability.

### A.     The law.

The "single employer" doctrine is encapsulated in the pertinent WARN Act regulation:

> Under existing legal rules, independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent. Some of the factors to be considered in making this determination are (i) common ownership, (ii)

---

[1] If the Court were to dismiss the case, it should be without prejudice and with express permission to re-plead. *Shane v. Fauver*, 213 F.3d 113, 115-17 (3d Cir. 2000).

[2] Maple Mountain Enterprises, Inc., dba Modere, and Maple Mountain Group, Inc., dba Modere, are collectively referred to as Maple Mountain. (Complaint, ¶ 1).

[3] https://www.zcg.com/about

1

common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.

20 C.F.R. § 639.3(a)(2). The leading cases construing and applying this doctrine under the WARN Act include *Pearson v. Component Technology*, 247 F.3d 471 (3rd Cir. 2001), *Childress v. Darby Lumber*, 357 F.3d 1000 (9th Cir. 2004), and *Guippone v. BH S&B Holdings*, 737 F.3d 221 (2nd Cir. 2013).

The "single employer" doctrine, utilizing the DOL factors and looking at the realities of entanglement and control, applies not only to "independent contractors, subsidiaries," and "parent[s]" (20 C.F.R. § 639.3(a)(2)) but to others such as equity investors, *Guippone*, 737 F.3d at 226, and lenders, *Pearson*, 247 F.3d at 496.

Courts applying this single-employer test in WARN Act cases commonly recognize these important principles: (1) no one factor listed in the regulation is controlling;[4] (2) the regulation's list of factors is (as the regulation explicitly says) non-exhaustive, thus allowing flexible application to specific circumstances as they arise;[5] (3) one way of framing the ultimate question is whether the two entities operated at "arms' length" or were more closely aligned than that;[6] and (4) if the *de facto* exercise of control factor is particularly striking – such as if an entity other than the nominal employer actually makes

---

[4] *See, e.g., Guippone*, 737 F.3d at 226.

[5] *See, e.g., Pearson*, 247 F.3d at 491.

[6] *See, e.g., Pearson*, 247 F.3d at 495 ("Affiliated corporate liability under the WARN Act is ultimately an inquiry into whether the two nominally separate entities operated at arm's length.").

2

the operative decision with no regard for the nominal employer's nominal legal separateness – then that in itself may suffice to make the decision-maker part of a "single employer" with WARN Act liability.[7]

If an entity other than the nominal employer exercised sufficient control over or was sufficiently entangled with the nominal employer, then that other entity is liable for the WARN Act violation.

> As an initial matter, we think it important to consider the policy considerations that animate the WARN Act. The purpose of the Act is to penalize those employers that close a plant and fail to comply with the notice requirements of the statute. Thus, the question of whether two entities constitute a "single employer" for WARN Act purposes "is ultimately an inquiry into whether . . . two nominally separate entities operated at arm's length" or whether, following an "assessment of the amount of control" exercised by one entity over another, it can be determined that two entities should be considered jointly liable for the closing and the subsequent lack of notice. ... Accordingly, the goal of the five-factor test here is to determine whether APA Truck Leasing had become "so entangled with [APA Transport's] affairs so as to engender WARN Act liability," or whether the two continued to function at arm's length as separate entities.

*In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 244 (3d Cir. 2008), quoting and citing *Pearson*.

The issue of de facto control is central in many cases, and is (at this point, at least) central in this one: "if the de facto exercise of control was particularly striking – for instance, were it effectuated by "disregarding the separate legal personality of its subsidiary," … -- then liability might be warranted even in the absence of the other factors." *Pearson*, 247 F.3d at 504.

---

[7] *See, e.g., Guippone*, 737 F.3d at 228, quoting *Pearson*, 247 F.3d at 504.

As an example of this principle in operation, summary judgment on "single employer" liability was entered in favor of plaintiffs in *Chaney v. Vt. Bread Co.*, No. 2:21-cv-120, 2023 U.S. Dist. LEXIS 148066, *21-26 (D. Vt. Aug. 23, 2023), because the private equity outfit had directed the plant closing in violation of the WARN Act. The principle is clear: if the private equity outfit makes the decision – exerting control without maintaining an arms' length relationship and without allowing the nominal employer to make the decision – then there is "single employer" liability.

**B.    The standard for a motion to dismiss.**

This case is, of course, only at the motion-to-dismiss stage. Plaintiffs do not have to prove their case. They only have to state a plausible claim. "What is required is that the complaint contain 'well-pleaded factual allegations'; the court must 'assume the[] veracity" of those allegations and then determine 'whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. 'Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests . . . .' *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (quoting *Twombly*)." *DSM IP Assets, B.V. v. Honeywell Int'l, Inc.*, 700 F. Supp. 3d 189, 195 (D. Del. 2023). Plaintiffs do not have to show at this point that they will probably win, even if all the allegations of the complaint are taken as true. *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 265 (3rd Cir. 2021) ("But plausible does not mean probable either."). The allegations only have to be strong enough to raise a reasonable chance that discovery will lead to evidence. "If [plaintiff's] allegations are true, there is a reasonable chance that

discovery will unearth more evidence of it. So he has plausibly stated a claim." *Gibbs v. City of Pittsburgh*, 989 F.3d 226, 230 (3rd Cir. 2021).

Defendants ask this Court to ignore any allegations that are made on information and belief. But Defendants misunderstand the law in this regard. The matters alleged on information and belief, in this case, are matters that are – for now and for the most part – internal to Defendants and particularly within their own information-keeping, to be brought fully to light in discovery. It is settled that "'information and belief' pleading is permissible 'when the facts at issue are peculiarly within the defendant's possession.'" *DSM IP Assets*, 700 F.Supp.3d at 196, *quoting Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 107 n.31 (3d Cir. 2015).

> The Third Circuit summarized the state of the law on this point nicely in *McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 267-68 (3d Cir. 2016), as follows:
>
>> This Court has explained that pleading upon information and belief is permissible "[w]here it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control"— so long as there are no "*boilerplate and conclusory allegations*" and "*[p]laintiffs . . . accompany their legal theory with factual allegations that make their theoretically viable claim plausible.*" . . . In fact, this Court has explained that "[s]everal Courts of Appeals accept allegations 'on information and belief' when the facts at issue are peculiarly within the defendant's possession."
>
> Other circuits have adopted essentially the same standard for assessing "information and belief" allegations. In a recent and detailed treatment of the issue, the Eighth Circuit held that "information and belief" pleading is permissible under *Twombly* and *Iqbal* if "such allegations are based on information that is within the possession and control of the defendant or are supported by sufficient factual material that makes the inference of culpability plausible." *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 955 (8th Cir. 2023); *see also Inova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 730 (5th Cir.

2018); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 442-43 (7th Cir. 2011); *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014).

*DSM IP Assets*, 700 F.Supp.3d at 196.

> **C.    Plaintiffs have sufficiently and plausibly alleged that all the Defendant "Z" entities were part of a "single employer," making them jointly and severally liable should Plaintiffs prevail on the merits.**

Defendants argue that the complaint is inadequate because it does not allege *which* of the various Z-named entities did exactly what in terms of the WARN Act violation. This argument misses the mark, because it misses the "single employer" doctrine entirely. With the allegations of the complaint taken as true, it is plausible that all affiliate entities were part of a "single employer" made up of all the Z and Zenni entities named as Defendants. Entities that make up part of the "single employer" all share in joint and several liability under the WARN Act. *See*, *e.g.*, *Garner v. Behrman Bros. IV, LLC*, 260 F. Supp. 3d 369, 381 (S.D.N.Y. 2017).

That – rather than any pre-discovery knowledge by plaintiffs that every particular affiliate itself, distinct from the others, took any particular action to violate the WARN Act – is at the core of the assertion of liability at this point in the case. They are all sued because they are all part of the Z Capital single-employer which exerted *de facto* control over, and was otherwise a single employer with, Maple Mountain.

The purpose of a complaint is to provide notice of the claim and its basis – and to provide enough plausibility to warrant discovery to nail down the details and obtain further evidence. This complaint amply serves those purposes. The intricacies of the web of entanglement among the various entities, and how the Z Capital group used those various

entities as shells and conduits, is a matter that is largely within the hidden knowledge of Defendants at this point. But Plaintiffs have adequately alleged that all the sued entities constitute a single employer together.

The complaint alleges that Mr. Zenni is the sole member of Defendant Zenni Holdings and the sole creator of Defendant Zenni Family 2018 GST Trust. (¶ 27(a)). Those are the Parent Entities. *Id.* It is therefore plausible to infer a likelihood that discovery will reveal evidence that Zenni controls those entities, and through his control over those entities that he also controls the other Defendant entities that the Parent Entities created. It is plausible (at least) to understand: when an individual creates a tangle of companies that are subsidiaries or affiliates of parent entities that he controls, and names them all after himself (or at least after his last name's initial) then he also controls all the subsidiaries or affiliates that he created and named after himself. That is not far-fetched or implausible, particularly here, considering the cited and quoted affidavit of a Z Capital insider.

The parent entities own Z Capital Group LLC. (¶ 27(b)). Z Capital Group, LLC, in turn (along with the Parent Entity Zenni Holdings) owns Z Capital Management LLC and Z Capital Partners GP II LP. (¶27(d)). Z Capital Group LLC also owns Z Capital Partners, LLC. (¶ 27(c)). Of those, Z Capital Management is the entity within the family that acts as the W-2 employer of the whole group. This very plausibly goes towards various of the *Pearson* factors for single-employer status: *de facto* control (as the Parent Entities exercise such control over all the affiliates by directing who employs all the employees that carry out all the various functions for all the affiliates' operations), unity of personnel policies,

and dependency of operations (as the various affiliates simply could not operate without the employees of Z Capital Management).

Z Capital Partners and Z Capital Partners GP II, in turn, own several Z-named funds (¶27(f)), several of which owned Maple Mountain (¶27(g)). The Complaint alleges, and it is true, that – even according to an insider's affidavit – the Z Capital family's Parent Entities control its affiliates who are the general partners and therefore controllers of those funds which own investments like Maple Mountain. (¶27(h)-(k)). This goes towards, at least, common ownership and *de facto* control, as well as dependency of operations, all of which are *Pearson* indicia of single-employer status.

And the man at the top, Mr. Zenni, is Managing Director and/or CEO of all of the named affiliates where he is responsible for all business operations of all of them. (¶27(m)). This goes towards, actually, all the *Pearson* indicia: (i) common ownership, (ii) common directors and/or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.

All the Z-named Defendants, furthermore, were dependent on Z Capital Group, LLC and Zenni Holdings for their daily operating funds either through direct infusion of capital from Z Capital Group or through financing obtained by it. (¶ 27(u)). Again, *de facto* control and dependency of operations.

This is enough, at this stage in the litigation. Discovery will reveal the details. For now, with the complaint's allegations taken as true, it is plausible to expect that discovery will reveal evidence that all the Defendants constituted a single employer among themselves. There was not an "arms' length" (*Pearson*) between or among any of the Z-

entities – indeed, not even a finger's length. Plaintiffs do not have to prove that at this point, but merely have to make it plausible. It is plausible.

> **D.    Plaintiffs have sufficiently and plausibly alleged that Z Capital group, and the Z-branded single employer was also a single employer with Maple Mountain, responsible for the WARN Act violation.**

Plaintiffs have also sufficiently and plausibly alleged that the Z Capital group was a single employer along with Maple Mountain – that the Z Capital group, under the *Pearson* test, constituted an employer of Maple Mountain's employees who were terminated without WARN Act notice.

This is, on its face, not a far-fetched or implausible claim. It is not unusual to see private equity outfits, having bought a company (like Maple Mountain) exert thoroughgoing control over that company, directing both the big decisions and often the smaller ones too. That is the common, if not near-universal, thing that such private equity outfits do. And the WARN Act's "single employer" doctrine – which is, in this regard, not exactly the same as any state-law or even any other federal-law veil-piercing doctrine – can and does impose liability on the chain of ownership in such a situation. *See*, *e.g.*, *Chaney v. Vt. Bread Co.*, *supra* (summary judgment for plaintiffs on single-employer claim similar to the one at issue here). Again, the quote from the Third Circuit, regarding the nature and purpose of the WARN Act's single-employer doctrine, is highly instructive:

> As an initial matter, we think it important to consider the policy considerations that animate the WARN Act. The purpose of the Act is to penalize those employers that close a plant and fail to comply with the notice requirements of the statute. Thus, the question of whether two entities constitute a "single employer" for WARN Act purposes "is ultimately an inquiry into whether . . . two nominally separate entities operated at arm's length" or whether, following an "assessment of the amount of control"

9

exercised by one entity over another, it can be determined that two entities should be considered jointly liable for the closing and the subsequent lack of notice. ... Accordingly, the goal of the five-factor test here is to determine whether APA Truck Leasing had become "so entangled with [APA Transport's] affairs so as to engender WARN Act liability," or whether the two continued to function at arm's length as separate entities.

*In re APA Transp. Corp. Consol. Litig.*, 541 F.3d at 244, quoting and citing *Pearson*.

The complaint in this case contains specific factual allegations that go to the various facets of single-employer status under *Pearson*. They make it quite plausible that the Parent Entities and the entire Z family of affiliated entities were not at "arm's length" from Maple Mountain; instead, they were "so entangled with" Maple Mountain's affairs, and exerted such an "amount of control," that they "should be considered jointly liable." *Id.*

When the Z Capital Group acquires a company like Maple Mountain, it does so through one of its "funds." Other investors can put capital into those funds as investment, but Z Capital's affiliates (which are controlled by Z Capital and the Parent Organizations) are the general partners of those funds. As such, Z Capital's affiliates retain sole authority and control over the ownership of the acquired companies. And, again, those Z Capital affiliates are in turn controlled by Z Capital and the Parent Companies. (Complaint, ¶ 27(h)-(k)). This is not something that can be disregarded as a conclusory allegation. Instead, it is based on a cited and quoted affidavit of a Z Capital insider, and is taken as true.

Common ownership.  Maple Mountain was owned, in its entirety, by the funds which were in turn owned by other affiliates of Z Capital which were, through the chain of ownership described above, owned by Zenni Holdings and the sole creator of Defendant

Zenni Family 2018 GST Trust. This factor therefore weighs in favor of the plausibility of single-employer status.

 Common directors and/or officers.  Mr. Zenni, the man at the top of the Z pyramid, is the Managing Director or CEO of Maple Mountain where he is responsible for all management and business operations. Again, this is a direct allegation of specific fact, to be taken as true. (¶ 27(m)). He was one of the three board members of Maple Mountain. (¶ 27(jj)).

Brad Oates, a board member of Maple Mountain, is also a trustee of the Zenni Family 2018 GST Trust, which is one of the Parent Entities. (¶ 27(n)).

This factor therefore weighs in favor of the plausibility of single-employer status.

Dependency of operations.   Under this factor, "courts generally consider the existence of arrangements such as the sharing of administrative or purchasing services … interchanges of employees or equipment … and commingled finances." *Pearson*, 247 F.3d at 500. The complaint squarely and factually alleges that there was "sharing of administrative and purchasing services and commingled finances." (¶ 27(p)). That is not an allegation of a legal conclusion, but an allegation of fact to be taken as true. It is further supported by examples as details. For instance, Z Capital required Maple Mountain to utilize the services of another Z Capital affiliate when Maple Mountain needed new technology services. (¶ 27(q)-(t)). Moreover, the complaint alleges – and it is taken as true – that Maple Mountain was dependent on Z Capital Group, LLC and Zenni Holdings for daily operating funds. (¶ 27(u)). This is dependency of operations to the utmost: the literal dependency on the parent's purse in order to survive. The Complaint further alleges, and it

11

is taken as true, that there was commingling of finances – including, as a specific example, an instance where Z Capital took out a loan on behalf of Maple Mountain but then used some of the loan proceeds for purposes other than Maple Mountain's business. (¶ 27(v)).

The complaint therefore contains enough to make it plausible that this factor, too, weighs in favor of single-employer status. (But even if the Court did not find that these facts go to the "dependency of operations" factor in particular, still these facts also go to the most-important "*de facto* control" factor, which is discussed below.)

Unity of personnel policies emanating from a common source.  The complaint not only alleges directly that Maple Mountain and all defendants had common personnel policies imposed by Z Capital. (¶ 27(x)). Beyond that, the complaint alleges specific and direct instances of control by Z Capital over personnel matters and policies at Maple Mountain.

Before making any hire, Maple Mountain was required to obtain approval by Mr. Zenni himself and by the Z Capital group's Managing Director-Head of Talent, who would sign off on such requests as "ZCG-HR." (¶ 27(y), (z)). The Complaint includes several specific named instances of this. (*Id.*)

Z Capital also decided who would be hired as Maple Mountain's President, by order from Z Capital's Partner-Head of Talent Acquisition. (¶ 27(ee)). Z Capital made all management-level personnel decisions at Maple Mountain. (¶ 27(dd)).

Z Capital also imposed a "total hiring freeze" at Maple Mountain, by order from Z Capital's Managing Director-Head of Strategic Finance. (¶ 27(aa)).

And Z Capital implemented, carried out, and controlled all of Maple Mountain's

12

benefit plans – even directly ordering Maple Mountain that it could not purchase, renew, or cancel any benefit plans without Z Capital's approval. (¶ 27(bb)-(cc)).

The complaint therefore contains enough to make this factor plausibly weigh in favor of single-employer status. (But even if the Court did not find that these facts were not enough to create plausibility for the "unity of personnel policies" factor in particular, still these facts also go to the most-important "*de facto* control" factor, which is discussed below.)

*De facto* exercise of control.  As noted above, a parent or other entity's *de facto* control over the decision to shut down the facility is, in some cases, enough in itself to engender single-employer liability on that entity. And so it is, here: it is *plausibly alleged*, which is all that it needs to be at this point, that Mr. Zenni (and with him, the Parent Companies and the single-employer made up of the various Z entities) made the decision that Maple Mountain would close its doors.

The Complaint alleges that Z Capital made the decision that Maple Mountain would close. (¶ 27(ff), (hh), (nn)). To the extent that it is alleged on information and belief, that is appropriate given the standard discussed earlier in this brief: the majority of the details of this are, as yet, particularly within the safe-keeping of Defendants. Discovery will bring those details out.

This allegation is made all the more plausible by the allegations that have been discussed already in this brief. Z Capital exerted sole control over major business decisions relating to Maple Mountain. (¶ 27(hh)). Maple Mountain could not even decide who would be its President (¶27(ee)), or decide on its own who would be hired into other management

13

positions (¶27(y)-(z)), or decide whether to institute a hiring freeze (¶ 27(aa)), or decide to renew or cancel a benefit plan (¶ 27(bb)-(cc)), or even make its own decisions about new technology contracts (¶ 27(q)-(t)).

With all those being under Z Capital's control, it certainly is all the more plausible that the most major of all possible decisions – the decision to shut down the business – would also be under Z Capital's control. It is hard to imagine that an ownership chain that was so intent on imposing its will in those other matters would not also impose its will on the life-or-death-of-Maple-Mountain decision.

And the allegation of Z Capital's control over the life-or-death decision is made even further plausible by the Complaint's allegations as to how that decision came to pass. Maple Mountain President Nate Frazier – who had been selected for that role not by Maple Mountain but by Z Capital (¶ 27(ee)) – called a board meeting. The three board members of Maple Mountain were himself, Mr. Zenni (the man at the top of the whole pyramid, owner of Zenni Holdings), and Mr. Oates (of the Zenni Family Trust). (¶28(jj)).

The board appointed a so-called "special committee" consisting of Mr. Oates (¶ 27(mm)), the Zenni insider. The purpose of that "special committee" was to attempt to insulate Z Capital from WARN Act liability. (¶ 27(kk)).

Nonetheless, the control by Z Capital was clear, under the Complaint's allegations: "At the meeting, Mr. Zenni informed the other members that Z Capital will no longer be funding Maple Mountain and directed the Special Committee to terminate all of the employees." (¶ 27(ll)).

That could not be more clear, and it is taken as true. At that meeting, Mr. Zenni

14

directed the Special Committee to terminate all of the employees of Maple Mountain. Mr. Zenni's mere status as one of three board members of Maple Mountain would not have given him that power, of course. One board member cannot make such a decision. What gave him that power, *de facto*, was that he was in charge of the entire Z Capital pyramid.

Under the authorities discussed above, including *Pearson* and *Vt. Bread*, this in itself would be sufficient to impose single-employer liability. Together with all the rest that has been discussed herein, it is enough – to say the least – to make it *plausible* that the single-employer test will ultimately be met here.

Entanglement, and lack of arm's-length distance.  As noted above and as emphasized by the Third Circuit, the essence of the single-employer test is not some mechanical calculation of factors. It is instead an overall assessment of whether there was an arm's length distance between the nominal employer and the owner (or other part on whom single-employer liability is sought to be imposed), or whether they were so entangled with so much control from above that they ought to be considered a single employer for WARN Act purposes. In this case, all of the allegations discussed herein make it quite plausible to conclude that Maple Mountain had no autonomy on major or even significant business decisions. Those were made by the Z Capital family, which fully exercised its will over Maple Mountain – and ultimately by Mr. Zenni. It is reasonable to expect that discovery will bring out more evidence of this.

For these reasons, the Motion to Dismiss should be DENIED.

15

Dated: December 3, 2025

By: /s/ James E. Huggett

**MARGOLIS EDELSTEIN**
James E. Huggett (#3956)
300 Delaware Avenue
Suite 800
Wilmington, DE 19801
Phone 302-888-1112
Fax 302-888-1119


**LANKENAU & MILLER, LLP**
Stuart J. Miller (SJM 4276)
100 Church Street, 8th FL
New York, NY 10007
P: (212) 581-5005
F: (212) 581-2122

**THE GARDNER FIRM, P.C.**
Mary E. Olsen (OLSEM4818)
M. Vance McCrary (MCCRM4402)
182 St. Francis Street
Suite 103
Mobile, Alabama 36602
P: (251) 433-8100
F: (251) 433-8181

***Attorneys for Plaintiffs***

16